## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,

vs.                                                         Case No. 3:11-cr-286-J-34MCR

QIAO CHU
WEI TANG LO
_____/

## **O R D E R**

**THIS CAUSE** is before the Court on Qiao Chu's Motion for Award of Attorney Fees and Expenses pursuant to 18 U.S.C. 3006A and 28 U.S.C. 2414 (Doc. 300; Motion), with exhibits (Def. Ex.) and Wei Tang Lo's Amended Motion for Award of Attorney Fees and Expenses Pursuant to 18 U.S.C. 3006A and 28 U.S.C. 2412 (Doc. 325; Amended Motion). Lo has also adopted Chu's Motion.[1]   The Government filed a response, see United States' Consolidated Response in Opposition to Defendants' Motions for Award of Attorney's Fees and Expenses (Doc. 353; Response), with exhibits (Resp. Ex.).   Chu replied.   See Reply Memorandum of Points and Authorities in Support of Motion for Award of Attorney Fees and Expenses Pursuant to 18 U.S.C. 3006A and 28 U.S.C. 2414 (Doc. 360; Reply). Accordingly, this matter is ripe for judicial review.

_____

[1] On June 19, 2013, Lo filed a Motion to Adopt (Doc. 301) Chu's attorney's fees Motion, which the Court granted on June 26, 2013, see Order (Doc. 306).   However, due to the factual differences between Lo and Chu, the Court instructed Lo to file an amended motion for attorney's fees that adequately addressed his own circumstances and claim. Lo filed an Amended Motion; however, it does not contain any substantive grounds to support his claim for attorney's fees.   See Amended Motion for Award of Attorney Fees and Expenses Pursuant to 18 U.S.C. 3006A and 28 U.S.C. 2412 (Doc. 325).   Therefore, when the Court refers to Defendants' arguments, it is referring to those raised in Chu's Motion, which Lo has adopted.

## I.    BACKGROUND

The criminal prosecution in this case centered around Qiao Chu, Wei Tang Lo, and Chin Shih Chou's ("Defendants") alleged scheme to import Chinese honey into the United States by labeling it as a blend of honey and rice syrup to avoid millions of dollars in antidumping duties.[2] The purpose of the antidumping duties is to prevent the importation and sale of honey at what the United States Government has determined to be less than the fair market value.  At the time of the events giving rise to the charges in this case, those duties were imposed on "natural honey, artificial honey containing <u>more than 50 percent</u> natural honey by weight, preparations of natural honey containing <u>more than 50 percent</u> natural honey by weight, and flavored honey."  Department of Commerce Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order, 66 Fed. Reg. 63670-02, 63671 (Dec. 10, 2001) (Antidumping Duty Order).[3]

The investigation leading to the charges in this case began on or about September 29, 2011, when the Department of Homeland Security, Homeland Security Investigations (HSI), received information from Customs and Border Protection (CBP) that Demeter Group, Inc. (Demeter), Fina Food Trading, Inc. (Fina Food), and other related entities, may have falsely declared containers of honey imported from China as rice fructose syrup to evade antidumping duties.  Testing performed by CBP on samples taken from some of the Demeter and Fina Food containers suggested the substances contained more than 50

---

[2] Chou has not filed a motion for attorney's fees pursuant to the Hyde Amendment. The Court notes that, even if he did, Chou would not be able to recover fees and costs under the Hyde Amendment because he was represented by a federal public defender. <u>See</u> <u>United States v. Adkinson</u>, 247 F.3d 1289, 1291 (11th Cir. 2001).

[3] Pursuant to 44 U.S.C. § 1507, "[t]he contents of the Federal Register shall be judicially noticed."   Accordingly, the Court takes judicial notice of the findings contained in the Antidumping Duty Order.

percent honey.[4] Through further investigation and interviews of various warehouse employees, HSI discovered that Chin Shih Chou owned Fina Foods and Chu was the point of contact for Demeter. HSI also learned of a third related entitled called Mega Farms US (Mega Farms), owned by Lo.

Even for those containers that CBP did not test, HSI believed it had reason to suspect the substance inside was honey rather than rice fructose syrup. HSI agents discovered that when containers imported by Demeter and Fina Food reached a warehouse for storage and shipping, Lo and Chou, allegedly at Chu's directions, removed the "rice fructose syrup" labels from the individual barrels and replaced them with "amber honey" labels before the barrels were shipped to buyers. One warehouse manager also reported to HSI that Chou provided false bills of lading to truck drivers who transported the barrels from the warehouse. According to the warehouse manager, the false bill of lading described the commodity as "drums of honey" and listed the shipper as Mega Farms, but the warehouse manager's bills of lading described the commodity as "rice fructose syrup" and listed the shipper as the warehouse.

On April 18, 2012, a grand jury sitting in the Middle District of Florida returned a Third Superseding Indictment (Doc. 100; Indictment) against Chou, Chu, and Lo.[5] In the first of thirteen counts of the Indictment, the government charged Defendants with conspiring to commit wire fraud in violation of 18 U.S.C. § 1343, to introduce in commerce

---

[4] It is not clear from the record what prompted the initial testing by CBP.

[5] The government initiated the instant criminal case on November 16, 2011, by the filing of a Criminal Complaint with a Criminal Complaint Affidavit "for the sole purpose of providing probable cause for the arrest of Chou and Chu. See Criminal Complaint (Doc. 1). The grand jury returned the first indictment on November 18, 2011, see Indictment (Doc. 14), charging Defendants with smuggling Chinese honey into the United States in violation of 18 U.S.C. §§ 542, 545.

fraudulently imported merchandise in violation of 18 U.S.C. § 542, to fraudulently import merchandise knowing it to have been imported contrary to law in violation of 18 U.S.C. § 545, and to fraudulently introduce misbranded Chinese honey into interstate commerce in violation of 21 U.S.C. §§ 331(a), 333(a)(2) and 343(a)(1).  See id. at 1-25.  In Counts Two through Seven, the government charged Defendants with committing wire fraud in violation of 18 U.S.C. §§ 1343 and 2, see id. at 26-27, and in Counts Eight through Eleven charged Defendants with importing Chinese honey that was misbranded as rice fructose syrup to avoid the payment of anti-dumping duties in violation of 18 U.S.C. §§ 542 and 2, see id. at 28-31.  Lastly, in Counts Twelve and Thirteen, the government charged Defendants with misbranding honey as rice fructose syrup with the intent to defraud and mislead in violation of 21 U.S.C. §§ 331(a), 333(a)(2), and 343(a)(1).  See id. at 32.

A critical issue in this case was whether the substances imported contained more than 50 percent honey by weight, thus making them subject to the significant anti-dumping duties.  The government planned to establish that the rice fructose syrup imported by Defendants contained more than 50 percent honey by weight through the expert testimony of Sharon E. Stricklin, a chemist in the CBP laboratory in Savannah, Georgia.  On July 12, 2012, Defendants Chu and Lo filed a motion to exclude Ms. Stricklin's expert opinions, arguing that Ms. Stricklin's methodology for determining the percentage of honey in a blend of honey and rice syrup was not sufficiently reliable under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  See Motion to Exclude Government's Proposed Witness Testimony under Fed. R. Evid. 702 at 3-4 (Doc. 122; Daubert Motion).[6] Defendants claimed "that the general consensus in the scientific community, and within

---

[6] Chu filed the Daubert Motion and Lo adopted it.  See Motion to Adopt (Doc. 128).

the United States government, is that no reliable scientific method currently exists to quantify the respective amounts of honey in rice-syrup/honey blends." Id. Indeed, they pointed out that as of November 29, 2011, HSI reported that its laboratory "could not determine the percentage of honey in" a sample identified as being "Rice Fructose Blend Syrup." Exhibit 6 to Daubert Motion (Doc. No. 122-6) at 2. Specifically, HSI stated, "The Savannah Lab do[es] not have a quantitative method at this time to be able to determine the percentage of honey in a blend such as the one submitted. The Savannah Lab did determined [sic] that there is honey present, but we cannot determine the amount." Id.

Defendants also relied on a June 21, 2012 determination from the United States Department of Commerce (the Department) acknowledging the current absence of a reliable, accepted method of determining the ratio of honey and rice-syrup in a mixture of the two. See Daubert Motion at 4, 6-8. The Department concluded that importers were circumventing the antidumping duty by importing blends of honey and rice syrup from China that had not been commercially available in the United States at the time the Antidumping Order was issued. See Honey from the People's Republic of China: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order, 77 Fed. Reg. 37378, 37381 (June 21, 2012), Exhibit 10 to Daubert Motion (Doc. Nos. 122-10 & 122-11; Preliminary Determination). In doing so, the Department explained that "the percentage of sugar in blends of honey and rice syrup is not determinate because one cannot identify the percentage of C-3 sugars blended with honey." See id. In light of this finding, the Department concluded that "without the ability to test for the relative amount of honey in a blend of rice syrup and honey, the '50 percent natural honey by weight' threshold in the scope is without meaning." Id. at 37381. Based on this finding, the

Department announced its intention to declare that all blends of honey and rice syrup that entered or were withdrawn from a warehouse on or after December 7, 2011, regardless of the percentage honey, would be subject to the Antidumping Order.   See id. at 37383.

At the Daubert hearing, the parties agreed that current methods of testing could readily quantify the relative amounts of honey (a C-3 sugar) and corn and/or cane syrup (C-4 sugars) based upon the carbon ratios in the sample.   See Daubert Hearing Transcript at 15 (Doc. 158; Daubert Hearing Tr.).   However, rice syrup, like honey, is a C-3 sugar, and known testing methods, such as using an isotopic ratio mass spectrometer, cannot distinguish one C-3 sugar from another C-3 sugar.   Id. at 15-16, 101, 143.   In response, the government argued that it did not need to quantify the specific percentage of honey in a blend of honey and rice syrup, but only needed to determine whether a blend of rice syrup and honey contains more or less than 50 percent honey, the threshold ratio implicating the antidumping duties.   Id. at 65.   The government submitted that Ms. Stricklin's new methodology, developed specifically for this case, was sufficiently reliable to overcome Defendants' Daubert objections.

Based upon the testimony presented at the Daubert hearing, the government's methodology for determining whether a particular sample contained more than 50 percent honey can be summarized as follows: (1) the government's expert, following the methods of Melissopalynology,[7] creates a slide for microscopic analysis; (2) the government's expert views the slide under the microscope; (3) the government's expert makes a subjective assessment as to whether the amount of pollen observed in the sample

---

[7] Melissopalynology is the study of pollen contained in honey and involves the counting of pollen grains to identify the pollen's source. See Opinion (Doc. 242) at 12.

constitutes a "relative abundance" or "overabundance" of pollen; (4) if the government's expert finds a "relative abundance" or an "overabundance," the sample is determined to contain more than 50 percent honey. Daubert Hearing Tr. at 62. Additionally, as to 19 of the samples, the government's method included comparison to one set of reference slides prepared using Vitex honey and corn syrup.

On September 28, 2012, the Court held a status conference at which the Court announced that it would grant the Daubert Motion and exclude the government's expert opinions regarding whether a particular syrup sample contained more than 50 percent honey by weight. See Transcript of Criminal Status Conference (Doc. 218; September 28, 2012 Status Tr.). At that time, the Court provided the parties with a summary of its analysis, explaining that exigent circumstances arising in other cases on the docket prevented the completion of a thorough written order in advance of the approaching trial date.[8] Id.

On November 11, 2012, the Court entered its written opinion. See Opinion (Doc. 242). In the Opinion, the Court initially expressed concern regarding Ms. Stricklin's qualifications to offer the specific opinions proffered by the government, as her opinion was based upon her observation of the relative amount of pollen in a particular sample, but she is not a pollen expert. Id. at 17. The Court concluded, however, that even if she was qualified to render an opinion about the relative amount of honey in the samples she tested, the government failed to establish that Ms. Stricklin's methodology was reliable or that her proposed testimony would assist the trier of fact. Id. at 19.

---

[8] Ultimately, however, Defendant Chu's filing of belated motions to suppress necessitated a delay in the trial date.

Specifically, the Court found, and the government did not dispute, that the methodology relied upon by the government was not generally accepted in the relevant scientific community. Id. at 19-20. The Court further noted that it was "undisputed that the government's new method has not been submitted for any peer review or evaluation." Id. at 21 (noting that "the fact that this method has not been subject to peer review and publication does not significantly undermine its reliability, but neither does it support its admissibility"). Next, the Court observed that the fact that "there are no known rates of error or standards for the application of the government's method, and that no effort has been made to test or refute Ms. Stricklin's hypothesis or verify the accuracy of her opinions, however, does significantly undermine the government's ability to carry its burden under Daubert." Id. In sum, the Court explained that

> The critical inquiry with regard to the methodology in this case is not whether it can discern whether the suspect samples contain more than 5 percent honey as suggested on the import documents. It is not whether the methodology can determine whether a sample contains a little bit or a lot of pollen. The question is whether the government has shown that using this methodology, its expert can make a reliable quantitative determination that a particular sample contains not some honey, not a lot of honey, not even 50 percent honey, but more than 50 percent honey by weight. The government has simply failed to carry this burden.

Id. at 33.

On November 13, 2012, the government filed a notice of appeal of the Court's Opinion. See Plaintiff United States' Notice of Interlocutory Appeal and Accompanying Certification (Doc. 245; Notice of Appeal). The next day the Court ordered that no further action be taken in the case until the government's appeal was resolved. See Endorsed

Order (Doc. 246). However, the government voluntarily dismissed the appeal on February 22, 2013. <u>See</u> Clerk's Entry of Dismissal (Doc. 257).

On March 11, 2013, the Court held a status conference to determine how the government wished to proceed in light of the Court's <u>Daubert</u> ruling and the government's decision to dismiss the appeal. <u>See</u> Transcript of Criminal Status Conference (Doc. 319; March 11, 2013 Status Tr.). The Assistant United States Attorney (AUSA) prosecuting the case, Russell Stoddard, informed the Court as follows:

> MR. STODDARD: With respect to the current indictment, Your Honor, if the government does go to trial on the indictment as it currently exists, then at the present time it would appear that the Title 21 offenses and the 371 conspiracy would be -- would still be viable.
>
> I will tell the Court that we are working on the possibility of a superseding indictment which could significantly alter the posture of the case in light of the <u>Daubert</u> ruling, as well as additional evidence that the government is in the process of getting as a result of a parallel prosecution in the Northern District of Illinois.

<u>Id.</u> at 6. After defense counsel expressed "a loss at what the theory of the case is going to be" in light the Court's ruling on the <u>Daubert</u> motion, the Court inquired of the AUSA as follows:

> THE COURT: . . . Mr. Stoddard, Counts Twelve and Thirteen as pled are that the defendants, with the intent to defraud, caused to be introduced into interstate commerce honey that was misbranded as rice fructose syrup.
>
> How does -- do you not have to prove that it was honey --
>
> MR. STODDARD: I don't have to prove scientifically that it was honey for purposes of the statute. I can put on end purchasers who can say, "This is what I bought. This is who I bought it from, and this is the product that I bought and subsequently sold as the product that was represented to me, that is to say, honey."

. . .

[DEFENSE COUNSEL]: Unfortunately I disagree because that -- that is what I -- in a previous pretrial proceeding I indicated to the Court that I was afraid would happen, that the government would try to bring in evidence, opinion evidence, and try to ply it in under something else that is excluded by the <u>Daubert</u> ruling. I'd respectfully submit that that is what was just described.

THE COURT: Well, what he said was that he would intend to prove that -- prove the intent to defraud by bringing in evidence that the item that end purchasers bought was labeled as honey and represented to them to be honey and that -- I guess he's going to show that that's the same stuff that was brought into the country labeled as rice fructose syrup.

Is that right?

MR. STODDARD: That's correct, Your Honor.

THE COURT: Now, I don't know if that's enough, but that doesn't have anything to do with the opinion evidence, Mr. Scroggie [(Chu's counsel)].

. . .

And then as to Count One -- I guess, Mr. Stoddard, what's the government's position --

. . .

MR. STODDARD: The government's position is that the defendants intended to smuggle in a product which they believed to be honey mislabeled as rice fructose syrup or rice fructose blended syrup in order to avoid the tariffs.

Whether or not they were successful or whether or not it was actually possible for them to commit or to accomplish the conspiracy is really irrelevant. It has to do with what their agreement was and what the intent was and what, if any, overt acts they may have done in order to accomplish the plan. It could be bubble gum as far as the government's concerned, and they could still be criminally liable under Court One.

Id. at 10-14.

On Monday, May 6, 2013, at what was supposed to be a sentencing hearing for Defendant Chin Shih Chou, who had previously entered a guilty plea, Mr. Stoddard requested a continuance as the government had received new testing results that concluded the substances imported by Lo, Chu, and Chou contained little to no honey. See Transcript of Sentencing Hearing (Doc. 279; Sentencing Tr.). Mr. Stoddard explained the disconcerting turn of events as follows:

> Last week we received -- well, to back up, in preparation for a superseding indictment against the remaining defendants, we became aware of a laboratory in Germany by the name of Intertek that is being used by a lot of food distributors in the United States, as well as almost all of the food distributors in the European Union, to do tests for adulteration and contaminants of food products.
>
> Once we became aware of this, I sought funding to send the samples of the suspected honey to this laboratory for testing. That funding was granted in April. Samples were sent from the CBP and Border Protection lab in Savannah, Georgia, to Intertek in Bonn, Germany.
>
> We received initial reports of their testing on Wednesday with a final summary report on Friday at about 11:45. The results from the German testing are in stark contrast to the testing that was conducted by CBP and Border Protection in that their tests concluded that the substance in question was predominantly syrups, either corn syrup or rice fructose syrup, with little if any honey contained in the samples that were presented to them.
>
> As a result of that, we are not prepared to go forward [with the sentencing] because [Chou], quite frankly, is not guilty of the crime to which he has pled guilty, at least based upon the scientific evidence that we have at this point in time.
>
> I have sought permission to dismiss the indictment. I have not received that permission. I have not received permission to ask for this continuance. However, given the

nature and circumstances of the case, I don't feel that I have any alternative.

I sent the information that I received Friday to Ms. Irvin [(Chou's counsel)], and I also spoke with her. She did not have an opportunity to talk with her client because [the translator] was out of the country. But I requested from Ms. Irvin at that time if we could file a joint motion for continuance, and she said she was not in a position to be able to do so. This was late Friday afternoon.

But I am asking for a continuance of one week with the idea being that between now and a week from today, I will receive permission to dismiss the indictment against Mr. Chou, and we'll make arrangements to get him home as quickly as possible.

Id. at 4-5.

Mr. Stoddard went on to state that he believed a crime had been committed, but that it was "not the crime that is charged and not the crime that [Chou] pled guilty to." Id. at 6-7. When the Court asked how the Intertek lab results could be so different, Mr. Stoddard responded, "I have no answer for that. I don't know. I mean, obviously the people at [CBP] took serious issue with the results that we received from Germany on Friday." Id. at 9. Mr. Stoddard assured the Court that he would "waste no time" in filing a motion for leave to dismiss the charges against the Defendants once he received permission from his supervisors. Id. at 11. Ultimately, the parties agreed to a one week continuance of the sentencing hearing to give the government time to dismiss the charges and to allow defense counsel time to look into Chou's immigration status.

Despite the week-long continuance, Mr. Stoddard moved to voluntarily dismiss the Indictment and all charges against all three Defendants the next day. See Request for Leave to Dismiss Indictment (Doc. 281; Voluntary Dismissal). The Court sua sponte scheduled a status hearing that same day to discuss the best way to handle the dismissal

given Chou and Chu's immigration status[9] and the Court's concern that if the Court granted the dismissal, Chu and Chou would be taken into immigration custody immediately upon their release from prison.[10]   See Transcript of Telephonic Status Conference (Doc. 291; May 7, 2013 Status Tr.).   The parties agreed that the best course of action would be to delay granting the voluntary dismissal by one day so that defense counsel could work out the immigration issues.   Id. at 22-23.

At the hearing the next day on May 8, 2013, after being advised that the immigration detainers had been lifted, the Court granted the request for leave to dismiss the charges against the Defendants in open court and entered a written order as well.   See Transcript of Telephonic Status Conference at 4 (Doc. 292; May 8, 2013 Status Tr.); Order (Doc. 287).   Subsequently, Chu and Lo filed the instant motions for an award of attorney's fees and other litigation expenses pursuant to the Hyde Amendment, arguing the Government's prosecution was vexatious, frivolous, and in bad faith.

## II.    APPLICABLE LAW

The Hyde Amendment provides for an award of attorney's fees and litigation expenses to a "prevailing party" in a criminal case "where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust."   Pub.L. No. 105-119, Title VI, § 617, 111 Stat. 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes).[11]

---

[9]   At the time of their arrests, Lo, Chu, and Chou were lawfully in the United States. However, Chu and Chou's visas expired while they were being held in pretrial detention based on the charges in this case.   As a result, an immigration detainer had been lodged as to each of them.

[10]   Lo was on pretrial release.

[11]   The Hyde Amendment is published as a statutory note at the end of 18 U.S.C. § 3006A, entitled "Attorney Fees and Litigation Expenses."

The criminal defendant bears the burden of proving by a preponderance of the evidence that the government's prosecution of him was vexatious, frivolous, or in bad faith.[12]  <u>See id.</u>; <u>United States v. Gilbert</u>, 198 F.3d 1293, 1302 (11th Cir. 1999).

Because the words "vexatious," "frivolous," and "bad faith" are not defined in the statute, courts have defined them based on their ordinary meanings.  <u>See e.g.</u>, <u>Gilbert</u>, 198 F.3d at 1298-99 (citing <u>Chapman v. United States</u>, 500 U.S. 453, 462 (1991)).  The Eleventh Circuit has defined "vexatious" as "without reasonable or probable cause or excuse."  <u>Gilbert</u>, 198 F.3d at 1298-99 (quoting Black's Law Dictionary 1559 (7th ed. 1999)).  A "frivolous" position "is one that is [g]roundless . . . with little prospect of success; often brought to embarrass or annoy the defendant."  <u>Id.</u> at 1299 (alteration in original) (quoting Black's Law Dictionary 668 (6th ed. 1990)) (internal quotation marks omitted); <u>see also</u> <u>United States v. Heavrin</u>, 330 F.3d 723, 729 (6th Cir. 2003) ("A 'frivolous' position is one lacking a reasonable legal basis or where the government lacks a reasonable

---

[12] In addition to proving that the government's prosecution was frivolous, vexatious, or in bad faith, a defendant seeking to recover fees and expenses under the Hyde Amendment must also show that:

> (1) his trial had been in progress during fiscal year 1998 or a subsequent year; (2) his net worth was less than two million dollars; (3) he had been a "prevailing party" in his criminal case, even though subject to possible retrial upon remand; (4) that his legal representation was not the result of court-appointment; and (5) his attorney's fees and costs are "reasonable."

<u>United States v. Adkinson</u>, 247 F.3d 1289, 1291 (11th Cir. 2001).  The Government disputes that Lo has established that his net worth was less than two million dollars or that Chu and Lo were "prevailing parties," as the government voluntarily dismissed the case. Response at 34.  Notably, the Eleventh Circuit has not addressed whether a defendant is a prevailing party for purposes of the Hyde Amendment when the government voluntarily dismisses the charges.  However, because the Court finds that the government's position in this case was not vexatious, frivolous, or in bad faith, it need not address whether Defendants have satisfied these additional requirements.

expectation of attaining sufficient material evidence by the time of trial."). In explaining

the difference between a vexatious action and a frivolous action, the Sixth Circuit instructed

as follows:

> Although there is undoubtedly an overlap in the meaning of the two words, the term "vexatious" embraces the distinct concept of being brought for the purpose of irritating, annoying, or tormenting the opposing party. See Webster's Third New International Dictionary Unabridged 2548 (1986); see also United States v. Knott, 256 F.3d 20, 29-30 (1st Cir. 2001) ("Without a finding of bad faith or improper motive, . . . if the government pursues a prosecution without any foundation or basis for belief that it might prevail, such a prosecution would more appropriately be deemed 'frivolous' than 'vexatious.' Reading 'vexatious' to encompass such a case would render it synonymous with 'frivolous' . . . ."), cert. denied, 534 U.S. 1127 (2002); United States v. Sherburne, 249 F.3d 1121, 1126 (9th Cir. 2001) (noting that "vexatious" "includes an element of maliciousness, or an intent to harass").

Heavrin, 330 F.3d at 729; see United States v. Shaygan, 676 F.3d 1237, 1243 (11th Cir.

2012) (respecting the denial of rehearing en banc) ("Shaygan II") ("Our interpretation of

the Hyde Amendment is consistent with the decision of the Sixth Circuit in [Heavrin].").

Finally, "bad faith" under the Hyde Amendment "is not simply bad judgment or

negligence, but rather it implies the conscious doing of a wrong because of dishonest

purpose or moral obliquity; . . . it contemplates a state of mind affirmatively operating with

furtive design or ill will." Gilbert, 198 F.3d at 1299 (quoting Black's Law Dictionary 139

(6th ed. 1990)) (internal quotation marks omitted). The Eleventh Circuit in Shaygan

explained "that a prosecution brought in bad faith is one where wrongful motives are joined

to a prosecution that is either baseless or exceeds constitutional restraints; a bad faith

prosecution is not necessarily vexatious or frivolous." United States v. Shaygan, 652 F.3d

1297, 1316 (11th Cir. 2011); see also Gilbert, 198 F.3d at 1303 ("[W]e will not hold that

prosecutors act in bad faith when they fail to anticipate how a court will decide an issue of first impression.").

"The Hyde Amendment is concerned with wrongful prosecutions, not wrongs that occur during objectively reasonable prosecutions." Shaygan II, 676 F.3d at 1239. Accordingly, to prevail on a claim for fees and costs under the Hyde Amendment, a defendant must prove that the overall litigating position of the United States was vexatious, frivolous, or in bad faith. Shaygan, 652 F.3d at 1315. The Eleventh Circuit has instructed that "[if] the prosecution is objectively reasonable[ . . .] then a district court has no discretion to award a prevailing defendant attorney's fees and costs under the Hyde Amendment." Id. at 1317. In its denial of rehearing en banc, the Shaygan II majority wrote to explain the essential question a district court must ask when evaluating a Hyde Amendment motion:

> The dissent misinterprets the panel opinion and states that it "collapses the Hyde Amendment inquiry into only a single question: were the charges against the defendant baseless?" Dissenting Op. at 1250. But the panel opinion holds that the appropriate inquiry under the Hyde Amendment is as follows: was it reasonable to prosecute this case? Plainly these are different questions.
>
> It is not difficult to imagine a prosecution that begins with objectively reasonable charges and later becomes unreasonable to prosecute. For example, the government could bring a case that was objectively reasonable at the outset and later discover evidence that proved that a defendant was not guilty. If the government continued to prosecute the case, the litigating position of the United States would be in bad faith.

Shaygan II, 676 F.3d at 1245.

Moreover, "a determination that part of the government's case is frivolous does not automatically entitle the movant to a Hyde Amendment award if the court finds that the

government's 'position' as a whole was not vexatious, frivolous, or in bad faith.   The district court, in other words, must not fail to see the forest for the trees."   <u>Heavrin</u>, 330 F.3d 730.   "The plain language, reinforced by the legislative history of the provision, places a daunting obstacle before defendants who seek to obtain attorney fees and costs from the government following a successful defense of criminal charges."   <u>Gilbert</u>, 198 F.3d at 1302-03.

## III.   DISCUSSION

Defendants assert that the government's prosecution of this case was vexatious, frivolous, and in bad faith.   Although they urge four grounds in support of their position, Defendants' main argument is that the government created a "sham test" to determine whether the rice fructose syrup they imported contained more than 50 percent honey.   In response, the government contends that "the fact that the government voluntarily dismissed this action before trial . . . provides evidence of good faith and counsels against a Hyde Amendment award."   Response at 33.   The government also maintains that "[t]he prosecution in this case was pursued in earnest until the government determined that newly discovered evidence made it unlikely that the government would be able to prove one or more charges in the indictment beyond a reasonable doubt."   <u>Id.</u>

### A.  <u>The Government's Test</u>

Defendants assert that the government's position was vexatious, frivolous and in bad faith, because CBP "concocted a sham test specifically for this case, designed to result in a conclusion that would support a finding of guilt," and "[t]he United States Attorney's Office knew, or should have known, that CBP's 'test' was a secret test not accepted in the scientific community[.]"   Motion at 8-9, 15.   Specifically, they contend that CBP

17

manufactured the test to have probable cause to arrest them and to have sufficient evidence to submit to the grand jury. Id. at 15. Defendants also argue that AUSA Stoddard should have known the test was manufactured and scientifically unproven, yet he used the fabricated test to try to force Defendants into a plea.

At the outset, this Court finds no evidence in the record to support a conclusion that the government's conduct was vexatious or in bad faith. Defendants point to no evidence suggesting that the government brought this action "for the purpose of irritating, annoying, or tormenting" Defendants. See Heavrin, 330 F. 3d at 729 (citation omitted). Similarly, nothing in the record before the Court indicates any ill will on the part of the government or a "conscious doing of a wrong." See Gilbert, 198 F.3d at 1299 (citation omitted). Moreover, while the question is close, the Court also finds that Defendants have failed to carry their burden in establishing that the government's reliance on CBP's newly developed testing method caused the government's overall litigating position to be frivolous. Instead, the record reflects that the government prosecuted this case in good faith, reasonably believing that Defendants were engaged in a scheme to import Chinese honey into the United States by labeling it as a blend of honey and rice syrup to avoid millions of dollars in antidumping duties.

The Department implemented the antidumping duty to prevent the sale of Chinese-origin honey in the United States for less than fair market value. See Antidumping Order at 63671. When Defendants' rice fructose syrup entered the country, the scope of the Antidumping Order covered only honey-syrup blends that were more than 50 percent honey by weight. Id. CBP could easily enforce the Antidumping Order in cases of honey and corn and/or cane syrup blends, because it could quantify the relative amounts of honey

(a C-3 sugar) and corn and/or cane syrup (C-4 sugars) based upon the carbon ratios in the sample using known testing methods. However, enforcement became more difficult, if not impossible, in cases of rice syrup and honey blends, which is a C-3 sugar like honey, because known testing methods could not distinguish one C-3 sugar from another C-3 sugar. When the Department began its investigation into honey imports from China, rice syrup and honey blends were not readily available in the United States market and therefore were not contemplated by the Antidumping Order. See Preliminary Determination at 37380 ("[E]vidence on the record shows that the first imports of blends of honey and rice syrup to the United States from the PRC did not occur until August 2004."). In its anti-circumvention Preliminary Determination, the Department concluded that "without the ability to test for the relative amount of honey in a blend of rice-syrup and honey, the '50 percent natural honey by weight' threshold in the scope is without meaning." Preliminary Determination at 37381.

To grant Defendants' Motions based on the assertion that CBP "concocted a sham test specifically for this case, designed to result in a conclusion that would support a finding of guilt," this Court would have to find that CBP acted in bad faith. However, the record does not support that conclusion. There is no question that the government's expert developed the methodology used to test the rice fructose syrup imported by Defendants for this particular case. Likewise, it is undisputed that at the time the charges were returned, the scientific community was in agreement that there was no reliable method for determining the ratio of honey to syrup in a blend of the two had been developed, and that this Court ultimately found the government's method did not satisfy Daubert. However, there is no evidence that CBP did not believe in the reliability and usefulness of the

methodology it developed. This Court has no doubt that Ms. Stricklin and her supervisor genuinely believed that they had developed a new and reliable method for determining whether a blend of rice syrup and honey contained more or less than 50 percent honey. Nothing in the record suggests that Ms. Stricklin developed this new method to irritate, annoy, or harass Defendants, or that she was motivated by ill will. In fact, the Court made the following observation regarding Ms. Stricklin after orally granting the Daubert Motion:

> I struggled with the fact that I'm impressed with Ms. Stricklin. I'm impressed with her theory. I'm impressed with her efforts to find a way to solve this puzzle, but based on the testimony that I heard from her and from her supervisor in particular, whose testimony was quite telling, what she has is a theory, and her theory is that using the methods of Melissopalynology and perhaps some other test, one can determine whether a particular rice syrup honey blend contains more than 50 percent honey, but it's just that. At this point it's just a theory.
>
> . . .
>
> If the question before the Court was whether there is honey present, there's no doubt that Ms. Stricklin's opinion would carry the day and be admissible. But the question isn't simply is there pollen in this sample. The question is a very precise question, and that is whether there is more than 50 percent honey by weight.

September 28, 2012 Status Tr. at 11-13.

Notably, CBP's desire to develop a method for determining whether a blend of rice syrup and honey contained more than 50 percent honey where none previously existed was not unique to this case. As Ms. Stricklin's supervisor explained at the Daubert hearing,

> Well, in the Customs laboratory, we are daily faced with innovative situations, and there are many analyses for which there -- there just is no methodology available. I mean, even today we have designer drugs coming in that's [sic] brand new,

you know, six months ago didn't exist, and there is not an established method for doing it. And we are developing methodologies to handle those unique situations on a regular basis.

Daubert Hearing Tr. at 111-12.

The Court acknowledged CBP's difficult position in its written Opinion granting the Daubert Motion:

> The Court recognizes that this science is evolving, in large part based on the ever-changing regulations, and applauds the CBP's efforts to keep up with the attempts to circumvent those regulations that are changing just as rapidly, if not more so. See Daubert, 509 U.S. at 597 ("We recognize that, in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes.").

Daubert Opinion at 34-35. While the Court ultimately found the government's testing method failed to meet Daubert's minimum reliability threshold, and therefore granted Defendants' Daubert Motion, Defendants have presented no evidence that would support a finding that CBP "concocted a sham test." The record evidence shows that CBP was sincerely interested in developing a new and reliable test that would allow it to enforce the Department's Antidumping Order. That CBP was unsuccessful in its attempt to do so does not mean the government's prosecution was vexatious, frivolous, or in bad faith. The Court recognizes, however, that the more difficult question is whether the prosecutor's reliance on the method made the government's position frivolous.

Defendants maintain that Mr. Stoddard knew or should have known that Ms. Stricklin's method was not accepted within the scientific community and therefore would not hold up in court. When the government decided to prosecute this case, testing

showed that some of the containers contained honey, but this was not the only evidence pointing to a conspiracy to avoid paying the antidumping duty on Chinese-origin honey. The government had evidence suggesting that after importing the rice fructose syrup and getting past customs, Defendants shipped the containers to warehouses where they stripped off the rice fructose syrup labels and pasted on labels that said the product was honey. The government's investigation was substantial and consisted of more than just CBP's tests. It included interviews of Lo, Chou and Chu, warehouse employees, customs house brokers, and representatives of companies who thought they were purchasing honey from Lo. Indeed, as discussed in part III. D. of this Order, the government had significant evidence corroborating its belief that the substance being imported either was honey or was being imported in derogation of the Antidumping Duty Order.

Importantly, "[f]or Hyde Amendment purposes[ ] ... the court must assess the basis for pursuing charges from the perspective of the government at the time." Shaygan, 652 F.3d at 1313 (quoting Knott, 256 F.3d at 35). Based on the evidence supporting the Indictment, the Court concludes that the government did not prosecute Defendants in bad faith. Moreover, "[t]he government did not knowingly or recklessly pursue a frivolous claim, or exceed any constitutional constraint." Shaygan, 652 U.S. at 1313. Defendants have not established that the government pursued "a prosecution without any foundation or basis for belief that it might prevail." Knott, 256 F.3d at 29-30. When viewed in hindsight, certainly the prosecutor failed to fully understand the shortcomings of the methodology developed by Ms. Stricklin and the challenges associated with proving the rice fructose syrup contained more than 50 percent honey by weight. However, the Court finds that these defciencies represent negligence on the prosecutor's part, and "[m]ere

negligence cannot form the basis of an award under the Hyde Amendment." <u>United States v. Capener</u>, 608 F.3d 392, 405 (9th Cir. 2010).

This Court is not prepared to equate frivolity with negligence. If the drafters of the Hyde Amendment had intended to award a prevailing party fees based on the government's negligence, they would have written negligence into the language of the Hyde Amendment. <u>See Gilbert</u>, 198 F.3d at 1304 ("The substitution of the narrower language of 'vexatious, frivolous, or in bad faith' in place of the broader language about lack of substantial justification, the removal of the phrase 'without foundation,' and the shifting of the burden of proof to the movant all show that Congress meant to sanction and deter prosecutorial misconduct, not prosecutorial zealousness."). Notably, the Eleventh Circuit has explained that a prosecution could begin "with objectively reasonable charges and later become[] unreasonable to prosecute." <u>Shaygan II</u>, 676 F.3d at 1245. "For example, the government could bring a case that was objectively reasonable at the outset and later discover evidence that proved that a defendant was not guilty. If the government continued to prosecute the case, the litigating position of the United States would be in bad faith." <u>Id.</u> Although this Court readily admits that it expected the government to move for dismissal sooner than it did in light of the Court's <u>Daubert</u> Opinion, the government's delay in doing so did not make its litigating position unreasonable.

> The government is entitled to weigh carefully whether or not to appeal the exclusion of evidence and to assess carefully whether or not to continue the case in the absence of the excluded evidence. In doing so, the government is engaging in precisely the sort of prosecutorial decisionmaking that is its business, and assessing the strength of the remaining case requires some consideration.

<u>Knott</u>, 256 F.3d at 32.

When the court granted the <u>Daubert</u> Motion, the prosecution was entitled to weigh its options before determining whether to move for dismissal of the Indictment. In doing so, the government had a right to consider whether to pursue an interlocutory appeal of the Court's decision. The Court orally announced its ruling on the <u>Daubert</u> Motion on September 28, 2012, and entered a written opinion on November 11, 2012. On November 13, 2012, the government filed a notice of appeal of the Court's Opinion, but voluntarily dismissed the appeal on February 22, 2013. <u>See</u> Clerk's Entry of Dismissal (Doc. 257). The government also sought and obtained funding to have the samples tested again by a laboratory in Germany that had developed a more reliable testing method. <u>See</u> Sentencing Tr. at 4-5. On Friday, May 3, 2013, the government received the test results stating there was little to no honey in the samples and informed defense counsel of the results the same day. The government informed the Court of the test results on Monday, May 6, 2013, and moved for dismissal on Tuesday, May 7, 2013, after the prosecutor received permission from his supervisors. The Court finds that based on the circumstances of this case, the government's delay in dismissing the Indictment does not mean the prosecution was vexatious, frivolous, or in bad faith.

The prosecutor's negligence in failing to fully understand the shortcomings of the methodology developed by Ms. Stricklin and the challenges associated with proving the rice fructose syrup contained more than 50 percent honey in this case is unfortunate but does not warrant an imposition of attorney's fees and litigation costs. Confusion and sloppiness does not amount to vexatiousness or frivolousness. <u>See</u> <u>United States v.</u> <u>Truesdale</u>, 211 F.3d 898, 909 (5th Cir. 2000) (finding prosecution may have been confused or sloppy but not frivolous or vexatious where its "star witness" testified that defendants

took no bets in Texas and the statutes under which defendants were charged required the government to prove bets were taken in Texas). In hindsight, the government's reliance on Ms. Stricklin's new methodology was a mistake, but pursuing the case was not frivolous. While ultimately rejected by this Court, the government's theory did not sink to the level of frivolity.

## B. Grand Jury

Next, Defendants contend that the government's failure to disclose exculpatory information to the grand jury caused the government's prosecution to be vexatious, frivolous, and in bad faith. Specifically, Defendants argue the government should have disclosed the following items of exculpatory evidence to the grand jury: (1) that there was no generally accepted scientific methodology for determining whether a blend of rice fructose syrup and honey contained more than 50 percent honey; (2) the existence of the 50 percent rule that triggers the antidumping duty; (3) the fact that various CBP labs had issued reports indicating CBP was unable to determine whether tested samples contained more than 50 percent honey by weight; and (4) that some CBP labs concluded that some samples contained less than 50 percent honey by weight.

It is axiomatic that the prosecution is not required to present exculpatory evidence to the grand jury. See United States v. Williams, 504 U.S. 36, 51 (1992) ("[R]equiring the prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body."). The role of the grand jury is to determine whether there is probable cause to believe a crime has been committed. Kaley v. United States, ___ U.S. ___, 134 S. Ct. 1090, 1097 (2014). The grand jury need only hear the prosecutor's side to make its determination as to

whether an adequate basis exists for bringing a criminal charge, and the prosecution has no duty to present evidence to the grand jury that is exculpatory or favorable to the accused.   Williams, 504 U.S. at 50-56.

Preliminarily, the Court notes that the government did inform the grand jury of the existence of the more than 50 percent rule.   See Resp. Ex. 8 (Grand Jury Transcripts, Testimony of Scott Kraich).   A juror asked HSI Agent Kraich whether there is "a difference between containing more than 50 percent or less than 50 percent," to which Agent Kraich responded, "Yeah.   The lab tested, and if it's over 50 percent honey, it's subject to the anti-dumping duties."   Id.   He further confirmed that if the substance contained less than 50 percent honey then the antidumping duty would not apply.   Id.

This Court has reviewed excerpts of the grand jury transcripts provided by Defendants and the government, and from those transcripts it appears that the government did not inform the grand jury of any CBP test results indicating samples contained little to no honey or that some CBP testing yielded inconclusive results.   It also appears the government did not inform the grand jury about the lack of a scientifically accepted method for determining the percentage of honey in a blend of rice syrup and honey or the shortcomings of CBP's new methodology.

Here, the government presented the evidence to the grand jury in the light most favorable to its position.   The government certainly could have given the grand jury more information regarding the testing methods used by CBP to determine that the substances imported by Defendants were honey or informed the grand jury of CBP test results that were favorable to Defendants.   However, the government was not required to do so. United States v. Waldon, 363 F.3d 1103, 1109 (11th Cir. 2004) ("The government is under

no duty to bring exculpatory evidence to the grand jury's attention.") (citing Williams, 504

U.S. at 51-55).    See also Costello v. United States, 350 U.S. 359, 364 (1956) (explaining

that "[i]f indictments were to be held open to challenge on the ground that there was

inadequate or incompetent evidence before the grand jury, the resulting delay would be

great indeed.").    Notably, while complications associated with testing for honey in a blend

of honey and rice syrup may have been known to CBP at the time of the last grand jury

panel, the Department had not yet issued its Preliminary Determination stating that there

was no scientifically accepted method for determining the percentage weight of honey in

such a blend substance.

Defendants essentially argue that the government should have informed the grand

jury of the CBP "sham" methodology for testing a blend of rice fructose syrup and honey.

However, as this Court has already determined, Defendants have not presented evidence

that would support a finding that the government created a "sham" test for the purpose of

misleading a grand jury and ultimately a court and a jury.    Assuming the items suggested

by Defendants were exculpatory, the government was under no obligation to disclose them

to the grand jury.    As such, the Court finds that the government's failure to disclose that

information to the grand jury did not cause the government's prosecution of this case to

be vexatious, frivolous, or in bad faith.

## C. Discovery Issues

To further support their claim that the government's prosecution was vexatious,

frivolous, and in bad faith, Defendants contend that the prosecutor refused to turn over

documents regarding CBP's testing method, or deliberately delayed its production of those

documents.    Motion at 6-8, 16.    Defendants assert that "a significant amount of time and

expense was expended in discovery disputes during the litigation of this case, primarily regarding the production of the laboratory reports issued regarding the testing of the syrup samples in this case."   Motion at 6.

Specifically, Defendants maintain that when they requested more detailed information about CBP's testing methods, the prosecutor's "response was to inform counsel, and the Court in a pretrial hearing, that [CBP] was not willing to disclose the nature of the test actually performed on the syrup samples."   Id.   Defendants contend that the government avoided disclosing the details of its testing methods until the magistrate judge ordered the government to turn over the material.   Defendants further complain that the government filed requests for unnecessary protective orders, provided overly redacted lab reports, and withheld exculpatory information.   In response, the government states that "[w]hile the difficulties experienced during discovery might have been avoided by additional diligence or greater attention to detail on the part of the prosecutor, negligence is not sufficient to justify a Hyde Amendment award."   Response at 32.

It appears that Defendants' requests for additional discovery regarding CBP's testing methods began on or about May 21, 2012, when Mr. Scroggie sent an email to Mr. Stoddard stating, in pertinent part:

> As we discussed briefly Friday, please ask your agents and/or laboratory personal to provide additional information regarding the lab testing in our case.   The lab reports that we have been provided describe the samples from containers with specified entry numbers, then set forth an opinion on the percentage of honey in the samples, followed by a listing of testing methods conducted on the samples. . . . In order to evaluate the case and/or prepare for trial, we need to be provided with the information regarding the individual testing methods conducted, and the results of each testing method conducted.

Def. Ex. 4.  Apparently the government had provided defense counsel with a two-page summary of the tests performed by CBP, but the government was in possession of considerable reports that further explained the summaries.  <u>See</u> Transcript of Criminal Status Conference (Doc. 310; July 13, 2012 Status Tr.).

On June 22, 2012, Mr. Scroggie renewed his discovery request by emailing a letter to Mr. Stoddard in which he again requested "the results and reports of the multiple individual test methods conducted on the syrup samples in the […] case."  Def. Ex. 5. Mr. Stoddard replied to the email on June 27, 2012, stating: "I hope to have everything in Jacksonville by Friday.  I will FedEx to you when I have received the items you have requested from CPB labs."  <u>Id.</u>

On July 9, 2012, the government filed a motion for protective order regarding the government lab test procedures, protocols, and methodologies, which the government defined as "Confidential Material."  <u>See</u> Government's Motion for Entry of Protective Order (Doc. 116; Motion for Protective Order); Resp. Ex. 14.  Attached to the Motion for Protective Order was a proposed protective order, <u>see</u> Proposed Protective Order (Doc. 116-1; Proposed Order), which stated that the Confidential Material would only be disclosed to defense counsel and those individuals employed by defense counsel to assist in the defense of the case.  Proposed Order at 1-2.  The Proposed Order also provided instructions to defense counsel on how to dispose of or return the Confidential Material after the conclusion of the case.  <u>Id.</u>

Lo did not object to the Motion for Protective Order.  Moreover, it appears that Chu's only objection was a provision in the Proposed Order that prohibited the parties from sending Confidential Materials outside the United States.  Chu objected because his

expert was in Germany. Motion for Protective Order at 5. Nevertheless, on July 16, 2012, the government withdrew the Motion for Protective Order. Notice of Government's Withdrawal of Motion for Protective Order and Proposed Protective Order (Doc. 127); <u>see also</u> Digitally Recorded Hearing on Pending Motion (Doc. 311; July 19, 2012 Hearing Tr.) ("[A]fter I was finally able to sit down and talk with one of the analysts and determine exactly what it was they were doing, I asked them to reconsider their request for protective order, and they did so.").

On July 12, 2012, when defense counsel still had not received the requested discovery, Chu filed a motion requesting the Court to compel the government to disclose the following:

> 1) The results and reports of scientific tests conducted by the CBP and Border Protection Laboratory, required to be disclosed by Rule 16(a)(1)(F); and 2) A written summary of any testimony that the government intends to use under Fed. R. Evid. 702, 703 or 705 (describing the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications) during its case-in-chief at trial, required to be disclosed by Fed. R. Crim. P. 16(a)(1)(G).

Motion to Prohibit Party from Introducing Undisclosed Evidence Pursuant to Rule 16(d)(2)(c), or in the Alternative to Compel Discovery at 1 (Doc. 121; Motion to Compel).[13] At a status hearing before this Court on July 13, 2012, Mr. Stoddard represented that he hoped to have the reports in his possession by July 17, 2012, so that he could turn them over to defense counsel at a hearing scheduled before the magistrate judge that day. July 13, 2012 Status Tr. at 6. Mr. Stoddard explained the delay by stating that the process of gathering the documents from the CBP labs took longer than expected, as there were

---

[13] Defendant Lo adopted this Motion. <u>See</u> Motion to Adopt (Doc. 128); Endorsed Order (Doc. 133).

hundreds of written reports to gather from CBP labs all over the country. <u>Id.</u> at 5-7; <u>see also</u> Response at 21.

The hearing before the magistrate judge was rescheduled from July 17, 2012, to July 19, 2012.[14] <u>See</u> Digitally Recorded Hearing on Pending Motion (Doc. 311; July 19, 2012 Hearing Tr.). At the hearing, Mr. Stoddard explained that his office was still in the process of gathering the reports, but would have them waiting for counsel to pick up after the hearing. <u>Id.</u> at 8. When the magistrate judge asked Mr. Scroggie whether he had any additional questions of Mr. Stoddard, Mr. Scroggie responded as follows:

> I do not. I -- at the present moment as I'm speaking, I don't. I still don't know, of course, what their method is to attempt to quantify the amount of honey in a rice syrup honey blend, but I guess I need to wait and see what he produces and then take it from there, if you will, Your Honor.

<u>Id.</u> at 13.

On August 6, 2012, Defendants filed a supplemental memorandum in support of its Motion to Compel, stating that the government's "July 19 production of documents fails to comply with the requirements of Fed. R. of Crim. P. 16(a)(1)(F)." Supplemental Memorandum at 1 (Doc. 136; Supplemental Memorandum). Defendants explained that the government had "provided the defense with approximately 8,000 pages of laboratory reports regarding the scientific testing conducted in this case. However, the names of the persons conducting the testing and other information has been redacted from these reports." <u>Id.</u> On August 15, 2016, the magistrate judge held a hearing on the Motion to Compel and the Supplemental Memorandum, after which he granted the Motion to Compel

---

[14] The hearing was supposed to be on the Motion for Protective Order, but when the government withdrew that motion, the hearing was rescheduled to July 19, 2012, to hear Defendant's Motion to Compel.

"to the extent that clean copies be presented to the defense with the reason for any remaining redactions provided as well. Otherwise, the motion will be denied without prejudice to any motion counsel believes appropriate after review of the new copy of the discovery." Order at 2 (Doc. 151). The magistrate judge further stated that based on the explanation provided by the government at the hearing, he did not find a Rule 16 violation had occurred. Id. at 3.

Apparently, the government considered filing another motion for protective order once it learned that it would have to provide copies of CBP's lab reports without redactions. However, when Chu objected, the government decided not to file the motion. See Resp. Ex. 15; Response at 22. Instead, the government provided the lab reports without redactions on September 21, 2012. See Resp. Ex. 16.

Notably, at the August 15, 2012 hearing, the magistrate judge asked counsel whether CBP had developed a relatively new test that the government did not want to reveal.

> THE COURT: Now, I believe you indicated in one of the hearings or pleadings that there was, I believe, if I recall correctly, a relatively new test that the United States had. You did not want to reveal for a while what the test was, although I think you since –
>
> MR. STODDARD: Let me clarify that. That was before I had spoken directly with anybody associated with the testing.
>
> THE COURT: Okay.
>
> MR. STODDARD: It was through second- and third-hand information that I was led to believe that there was a very sophisticated testing that was taking place. The testing, quite frankly, that the government is relying on and what CBP relied on is not that sophisticated. In fact, it's not sophisticated at all, as will be revealed tomorrow in the Daubert hearing; but, nevertheless, the government is relying on it and believes it's

> appropriate and certainly sufficient for the laboratory analyst, as well as CBP that the substance they were testing was more than 50 percent honey.

Transcript of Motion Hearing at 12-13 (Doc. 341).

Mr. Stoddard also explained that the individuals responsible for records requests at the individual CBP labs were gathering and preparing the reports as if they were turning over information pursuant to a Freedom of Information Act Request. <u>Id.</u> at 22-23. When defense counsel brought the problem before the magistrate judge, Mr. Stoddard immediately agreed that the defense was entitled to the redacted information and stated that he would provided unredacted versions as soon as possible. <u>Id.</u>

The Court finds the record to be devoid of evidence suggesting the government carried out its discovery responsibilities with a "dishonest purpose or moral obliquity" or operated with a "furtive design or ill will." More importantly, the record utterly fails to support a finding that the government purposely delayed turning over much-needed discovery documents to hide exculpatory information, conceal the details associated with CBP's testing methodology, or otherwise prejudice Defendants' ability to pursue their <u>Daubert</u> Motion or prepare for trial. Indeed, Defendants were thoroughly prepared to present evidence and argue in support of their <u>Daubert</u> Motion, on which they ultimately prevailed. There is no doubt that the government could have acted more expeditiously and more thoughtfully in its efforts to provide the defense with the discovery relating to the testing methods. However, "[t]raditional sanctions exist for discrete wrongs like discovery violations that occur during an otherwise reasonable prosecution, but an award of attorney's fees under the Hyde Amendment is not one of those sanctions." <u>United States v. Shaygan</u>, 676 F.3d 1237, 1239 (11th Cir. 2012). The Court finds the government's

performance in executing its discovery responsibilities was imperfect, but did not cause its overall litigating position to be vexatious, frivolous, or in bad faith.

### D.  Evidence to Support Conspiracy Charge

Finally, Chu contends that the United States Attorney's Office "deliberately and vigorously" prosecuted him despite the fact that there was no evidence to show that he was a member of the alleged criminal conspiracy.  Motion at 10, 16.  The government, on the other hand, asserts that it has "persuasive evidence of his involvement . . . including Lo's statements that Chu told him the product being imported was honey and that Chu asked Lo for a sample that Chu could provide to CBP for testing."  Response at 29.

The Indictment charged Defendants with violating the general federal conspiracy statute, which makes it a crime to "conspire . . . to commit any offense against the United States."  18 U.S.C. § 371; See United States v. Guerra, 293 F.3d 1279, 1285 (11th Cir. 2002) ("The essential elements of the offense of conspiracy under 18 U.S.C. § 371 are an agreement between two or more persons to commit a crime against the United States and an overt act by one of them in furtherance of the agreement.").  The United States Supreme Court recently reiterated that "the fundamental characteristic of a conspiracy is a joint commitment to an 'endeavor which, if completed, would satisfy all of the elements of [the underlying substantive] criminal offense.'"  Ocasio v. United States, 136 S. Ct. 1423, 1429 (2016) (quoting Salinas v. United States, 522 U.S. 52, 65 (1997)).  The Supreme Court further explained that

> [a]lthough conspirators must "pursue the same criminal objective," "a conspirator [need] not agree to commit or facilitate each and every part of the substantive offense." Salinas, supra, at 63, 118 S. Ct. 469.  A defendant must merely reach an agreement with the "specific intent that the underlying crime be committed" by some member of the

conspiracy. 2 K. O'Malley, J. Grenig, & W. Lee, Federal Jury Practice and Instructions: Criminal § 31:03, p. 225 (6th ed. 2008) (emphasis added); see also id., § 31:02, at 220 (explaining that a defendant must "intend to agree and must intend that the substantive offense be committed" (emphasis added)). "The government does not have to prove that the defendant intended to commit the underlying offense himself/herself." Id., § 31:03, at 226.

Ocasio, 136 S. Ct. at 1429.

The government's theory of the case was that Defendants conspired to import Chinese honey into the United States by falsely labeling it as a blend of honey and rice syrup to avoid millions of dollars in antidumping duties. Based on the HSI investigative reports attached to the government's Response, it appears HSI's investigation in this case began on September 30, 2011, when CBP obtained samples from containers of rice fructose syrup imported by Demeter and located in a warehouse in Jacksonville, Florida. Resp. Ex. 1 at 8 (HSI Reports of Investigations Composite Exhibit); see also Criminal Complaint at 9-14; (Doc. 1; Complaint). CBP also obtained and tested samples of rice fructose syrup imported by Demeter and located at a warehouse in Norfolk, Virginia. Complaint at 5-9. Based on its testing, CBP believed the substance in the containers contained more than 50 percent honey. Id.; Resp. Ex. 3. HSI also located containers of rice fructose syrup imported by Demeter and Fina Food being stored in warehouses in Wilmington, North Carolina, and Savannah, Georgia. Through interviews of the warehouse employees, HSI agents learned that individuals, who the employees later identified as Chou and Lo in photo spreads, removed the original "rice fructose syrup" labels and replace them with "amber honey" labels. See Complaint at 16-24. As a result, HSI concluded all of the containers were subject to anti-dumping duties.[15]

_____

[15] HSI located many containers of rice fructose syrup imported by Demeter and

HSI eventually learned that Chou owned Fina Food and that he had purchased it from Lo.   Resp. Ex. 1 at 53.   Lo sold Demeter to another individual, who then employed Chu to act as Demeter's representative in the United States.   The government believed that to execute their conspiracy, Chou imported honey from China through Fina Foods and Chu imported honey from China through Demeter.   Once the commodity entered the United States, Lo's company, Mega Farms, was responsible for shipping the commodity to warehouses for storage and then arranging for transportation to domestic buyers.   See Indictment at ¶¶ 1, 12.   According to the government, Fina Foods and Demeter began importing shipments of rice fructose syrup, believed to be honey, in July 2011, almost immediately after Lo sold the companies.   See Indictment at ¶¶ 6-9.

While Chu's exact position as an employee of Demeter is not clear, the government asserted that Chu and Chou associated themselves as partners, even though each was employed by a different entity.   To support this position, the government relied on an email Chu sent to a customs house stating that Chou had the right to know everything about shipments made by Chu because they were partners.   Resp. Ex. 4.   During Chu's interview with the government after his arrest, Chu described his position with Demeter as a "business assistant," but also acknowledged that he was the sole representative of Demeter in the United States and that he was responsible for handling Demeter's imports in the United States.   Resp. Ex. 1 at 24.

---

Fina Food.   However, the Court need not exhaust every detail of the government's investigation in this case.   Detailed information about the number of containers imported by Demeter and Fina Foods and investigated by HSI may be found in the HSI investigative reports attached to the government's response.   See Resp. Ex. 1.

On November 16, 2011, HSI arrested Chou in Jacksonville for conspiracy to smuggle goods into the United States.   Resp. Ex. 1 at 16.   Three HSI agents interviewed Chou.   Id.   During the interview, Chou told HSI agents that he purchased Fina Food for $3,000 from Lo.   Id. at 21.   He explained that he used Fina Food to import commodities from China, which he then sold to Mega Farms.   Id. at 20-21.   He also identified Chu from a photo spread as the "point of contact" for Demeter.   Id. at 18.   Chou told HSI agents that Chu, as a representative of Demeter, paid him to pay warehouses to remove rice fructose syrup labels and replace them with honey labels.   Id. at 17-18.   Chou also said he thought the commodity was in fact rice fructose syrup, but that his costumers wanted the honey labels.   Id. at 18.   Chou explained that he thought he was asked to put honey labels on the barrels "to have more money."   Id. at 20.   He told HSI agents that he did not know it was illegal to remove labels.   Id.

In December 2011, Glory Bee Farms provided HSI with information regarding the six containers they received from Lo that were shipped from a warehouse in Jacksonville. Resp. Ex. 1 at 39.   Glory Bee's senior quality assurance technician stated that laboratory testing of the shipments substantiated that the commodity was pure honey.   Id. at 41. The senior buyer also confirmed that the rate Mega Farms charged for the commodity was competitive with the industry price for honey.   Id.

On May 21, 2012, the HSI agents interviewed Lo.   Id. at 63.   Lo indicated that he was working with Chinese honey manufacturers who were looking for American import companies "to help import honey to beat the anti-dumping duties."   Id. at 64.   "Lo stated that he had an arrangement with the Chinese supplier to buy honey from China if it was already in the US."   Id.   Lo also told HSI agents that Chou and Chu began importing

honey.  Id. at 65.  Lo explained that "he was tipped off to this when they started asking him certain questions about people he knew in China."  Id.  According to Lo, Chou told him that "he wanted to import syrup with honey inside."  Id. at 66.  HSI agents interviewed Lo again on June 5, 2012.  Resp. Ex. 1 at 70.  During this interview, Lo admitted using false certificates of origin.  Id. at 71.  He also informed the government of containers of Chinese honey imported by other companies and currently being stored in warehouses all over the United States.  Id. at 72.  Lo stated twice that that "he knew the honey was from China."  Id. at 71.

There is no doubt that the government had a stronger case against Chou and Lo. Warehouse employees witnessed Chou and Lo removing rice fructose syrup labels and replacing them with honey labels.  Chou also admitted to paying warehouse employees to remove the rice fructose labels from the individual barrels on behalf of Demeter and Fina Foods.  Id. at 18.  Warehouse employees corroborated this statement.  Id. at 36.

The government asserted that through Mega Farms, Lo sold the products imported by Chu and Chou to Grape Farms and Glory Bee Foods.  See id. at 39.  The government had evidence showing that Lo provided fictitious bills of lading to truck drivers hired to transport the rice fructose syrup, re-labeled as honey, to purchasers in the United States. Id.  Glory Bee Farms provided HSI agents with fake certificates of origin provided by Lo. Id.  The certificates listed shipping container identification numbers and stated the country of origin was Mongolia.  Id.  However, upon further investigation by HSI, there appeared to be no record of the shipping containers associated with those identification numbers being imported into the United States from Mongolia.  Id.; See also Resp. Ex. 5. Representatives of Glory Bee Farms and Grape Farms told HSI agents that it was their

intent to purchase honey from Lo, not rice fructose syrup. Resp. Ex. 1 at 39. According to Glory Bee Farms and Grape Farms, the commodities they purchased from Mega Farms were labeled as honey. Id.

While the government's case against Chu may not have been as strong as its case against Lo and Chou, the government could reasonably argue that Chu was engaged in a "joint criminal conspiracy to commit the underlying crimes of" wire fraud in violation of 18 U.S.C. § 1343, introducing in commerce fraudulently imported merchandise in violation of 18 U.S.C. § 542, fraudulently importing merchandise in violation of 18 U.S.C. § 545, and fraudulently introducing misbranded Chinese honey into interstate commerce in violation of 21 U.S.C. §§ 331(a), 333(a)(2) and 343(a)(1). See Indictment at 1-25. See Ocasio v. United States, 136 S. Ct. 1423, 1429 (2016) ("[A] conspirator [need] not agree to commit or facilitate each and every part of the substantive offense." (quoting Salinas v. United States, 522 U.S. 52, 65 (1997))). The government's position against Chu, albeit weaker without the CBP testing results, was not "so obviously wrong as to be frivolous." Gilbert, 198 F.3d at 1304.

Notably, at a status hearing after the Daubert ruling, Chou's attorney represented that she wanted to move forward with the Court's adjudication of guilt and imposition of sentence so that Mr. Chou could get home. See Transcript of Motion Hearing (Doc. 318; January 22, 2013 Hearing Tr.). After the Court expressed concern over whether the conspiracy charge to which Chou plead would be dismissed in light of the Daubert ruling, the following exchange occurred between the Court and Chou's attorney, Ms. Irvin:

> The COURT: . . . From your understanding of the evidence, if Mr. [Chou] went to trial, regardless of the resolution of the – if Mr. Chou were to withdraw his plea and go to trial

regardless of the resolution of the motion to suppress, would the government have evidence to support its case?

> MS. IRVIN: I do think that the government would have evidence to support its case. I don't know what a jury would do with it, but I do know that there are some extensive efforts that were exerted to bring the substance into the United States . . . In other words, Your Honor, if this wasn't Chinese-origin honey, it appears that people went through a great deal of effort to bring rice fructose syrup into the United States."

at 14-15.

Defendants rely on United States v. Adkinson, 247 F.3d 1289 (2001) to support their position that the government's position was vexatious, frivolous, and in bad faith. Defendants contend that "[a]kin to the scenario in Adkinson, the government charged the defendant with a crime that had not been committed." Motion at 15. This case is readily distinguishable from Adkinson. In Adkinson, the government did not charge the defendants with a crime that had not been committed, but instead prosecuted the defendants on charges the government knew did not constitute crimes, as established by binding Eleventh Circuit precedent. Id. at 1293. The Eleventh Circuit also found that "the government, [w]ith full knowledge that it was contrary to recent and controlling precedent, … induced the grand jury to charge" defendants for crimes that did not exist under the law. Id. at 1292 (internal quotation marks and citation omitted). On those facts, the Eleventh Circuit concluded that "[p]rosecuting appellants in defiance of controlling authority constitutes 'vexatious,' 'frivolous,' and 'bad faith' prosecutions." Id. (citing Gilbert, 198 F.3d at 1296). In this case, however, Defendants do not allege that they were charged with conduct that did not constitute a crime.

Chu also points to the fact that the prosecutor had an immigration detainer placed on Chu to prevent his pretrial release as evidence that the prosecution was vexatious,

frivolous, and in bad faith. When the Court indicated that it was inclined to grant Chu's motion for pre-trial release, the government went around the Court by seeking an immigration detainer based on the expiration of Chu's visa. While the Court did not agree with the decision, the Court recognized the government's fear that Chu was a flight risk was a legitimate one. <u>See</u> Order (Doc. 94) ("Based on his lack of ties to the United States and significant ties to China, the government has met its burden to show that Defendant poses a serious risk of flight and no condition of release could reasonably assure his appearance.").

## IV.    CONCLUSION

Throughout the unfortunately long pendency of this prosecution, the Court had the opportunity to constantly observe the conduct and demeanor of the government's attorneys, agents, and expert witness. To be sure, the government did not have a winning case. Nonetheless, the government had a reasonable basis for its prosecution and its actions, which were neither frivolous or vexatious nor pursued in bad faith. Although sympathetic to the hardships suffered by Defendants because of this prosecution, the Court finds that Defendants have not carried their burden of establishing by a preponderance of the evidence that the government's overall litigating position was frivolous, vexatious, or in bad faith. Therefore, the Motions are due to be denied.

Accordingly, it is hereby

**ORDERED:**

1. Chu's Motion for Award of Attorney Fees and Expenses Pursuant to 18 U.S.C. 3006A and 28 U.S.C. 2414 (Doc. 300), filed on June 18, 2013, is **DENIED**.

2. Lo's Amended Motion for Award of Attorney Fees and Expenses Pursuant to 18 U.S.C. 3006A and 28 U.S.C. 2412 (Doc. 325), filed on September 13, 2013, is **DENIED**.

**DONE AND ORDERED** in Jacksonville, Florida this 19th day of December, 2017.

MARCIA MORALES HOWARD
United States District Judge

lc23

Copies to:
Counsel of Record
Wei Tang Lo